[L. A. No. 20878. In Bank. Nov. 30, 1949.]

INDUSTRIAL INDEMNITY COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, HAZEL PAULINE SPIDLE et al., Respondents.

Herlihy & Herlihy and E. Hubert Herlihy for Petitioner.

T. Groezinger and John A. Rowe, Jr., for Respondents.

CARTER, J.—Petitioner, insurance company, seeks an annulment of an award of respondent commission reforming and

enforcing as reformed a workmen's compensation insurance policy, whereby the widow of the deceased workman, a relative of the employer, was allowed death benefits.

Prior to August 1, 1946, R. C. Cornish and Roland T. Schultz were partners in a business venture. A policy of workmen's compensation insurance was issued to the partnership and to the partners jointly but not severally, running from January 22, 1946, to January 22, 1947, covering all of their employees. On the subject of whether relatives were excluded, the policy provided that if a partnership was the insured it would not include partners but nothing was said as to relatives of the partners. With respect to relatives, it provided that if the policy is issued to an "individual" then such individual's relatives are not covered. Schultz, having sold his interest in the business to Cornish in July, 1946, a new policy was issued by the petitioner dated January 17, 1947, but covering the period August 1, 1946, to August 1, 1947, and presumably the partnership policy was canceled. The new policy ran to Cornish as an individual and the clauses with respect to relatives were the same as in the partnership policy. Thus it could be reasoned that as long as the insured was a partnership, the employees of the partnership would not be excluded even though related to one of the partners, but when an individual was the insured, his relatives are excluded. This presents the question of the extent to which the coverage was intended to be affected by the change of the insured from a partnership to Cornish alone, the individual, when the arrangement was made for the cancellation of the partnership policy to be replaced by an individual-insured policy. That is to say, was it contemplated that the change from a partnership insured to an individual insured would affect only the name in which the policy was to stand, or was it to go farther and bring into operation the clauses that excluded relatives when the insured was an individual rather than a partnership?

The circumstances surrounding the issuance of the above mentioned policies are as follows: The partnership was dissolved on August 1, 1946, and notices of such dissolution were sent to all persons with whom the partners had dealt, including petitioner, and Clarence Haugen. Haugen was an insurance broker who procured the partnership policy for the partnership. While in such capacity he was the agent for the partnership, and later, for Cornish in connection with the procurement of the insurance. There is evidence from which

it may be inferred that he was petitioner's agent for the collection of premiums on policies inasmuch as the invoices or bills for premiums from petitioner stated that Cornish should pay the premiums to "your agent" Haugen. On October 23, 1946, Mrs. Cornish, the wife of Cornish, who acted as his book-keeper and who handled all his insurance matters, called on Haugen to make out payroll reports and see about the change of name resulting from the partnership dissolution. At that time, Spidle, Cornish's son-in-law, and his son, Arthur Cornish, were employed by Cornish, and Haugen was aware of the relationship and employment. (There is a conflict on that subject but the evidence clearly establishes it.) The system of arranging for premiums in workmen's compensation insurance contemplates a payment by the insured at the time the policy is ordered. Thereafter, at periodic intervals, sometimes monthly, the insured makes a payroll report to the insurer which shows his employees and compensation received. On the basis of these reports the premium is computed and a statement sent to the insured. There may be a credit in favor of either the insurer or insured depending upon the relation of the figures arrived at by the computation and the initial deposit. Haugen assisted in preparing the reports for August and September, 1946, and the premiums for those months were paid to Haugen. Spidle was listed by name on the payroll and it may be inferred Haugen knew of the presence of his name thereon. Haugen, being doubtful as to how the change in the named insured should be accomplished, telephoned petitioner's office and was advised by a Mr. Furbush that the partnership policy should be sent in for cancellation and the insurance would be rewritten to name Cornish alone as the insured and dated back to August 1, 1946.

In the Report of Referee (Report of Record) dated April 22, 1947, we find this statement: "When the witness [Mrs. Cornish] left the broker's [Haugen's] office after having left with him for cancellation the old compensation and liability policy on the partnership, and arranging for the issuance of a new policy in their stead, the witness remarked to the broker in substance, 'I have nothing to show now that we are insured, are we *fully covered*?' The broker replied in substance, 'Yes, you are fully covered, don't worry.' The broker had said that he would write a new policy as of Aug. 1, 1946. The broker had been introduced to the defendant's [Cornish's] son, Arthur, and the decedent as the defendant's son-in-law on

the Sunday in January when he first came to their house in connection with writing the policy on the partnership." The petitioner stresses the theory that Mrs. Cornish intended to order exactly the same type of policy, with the exception of a change in name from a partnership to an individual insured. It appears quite obvious that the employer intended to order a policy naming him as individual insured with *full coverage for all his employees.* Much importance is attached to the provision in the original policy declaring that certain relatives are excluded if the insured is an individual. This would seem to be most unimportant since that policy was issued to a *partnership under the terms of which such relatives were not excluded.* It would seem that what Mrs. Cornish intended to order was a policy extending the same coverage under a different name.

Haugen, at the time Mrs. Cornish took in the old policy for cancellation, called Furbush, admittedly an agent of the defendant carrier, to ascertain the manner in which the matter should be handled. Petitioner states, in its briefs, that Haugen "may have been" its agent for collection of premiums, and that Haugen "was its agent for collection," but it is denied that he was an agent for the purpose of effecting or extending coverage, yet it is admitted that the oral agreement, made by Haugen with Mrs. Cornish, to the effect that the policy of insurance would be retroactive from August 1, 1946, is valid. Haugen then sent a letter to petitioner in which he stated that the partnership policy should be canceled as of August 1, 1946, because of "change of entity" of the insured; that the policy should be "rewritten" effective August 1, 1946, naming Cornish as an individual, as insured; and that enclosed were checks, one for $29.75 for the balance of premium due on partnership policy, and one for $54.21, for premiums on the policy to be "rewritten" according to payroll report for August 1, 1946, to October 1, 1946. No word was heard from petitioner until January 17th or 20th, 1947, when the rewritten policy was finally received by Cornish. This was after the accident occurred (Dec. 10, 1946) in which Spidle lost his life. After that accident, there being some doubt about the coverage of the policy, Haugen communicated with petitioner, and, as a result, a rider appeared on the policy when finally received which specifically named Arthur Cornish as covered although a son of Cornish. Petitioner made no offer to return the premium collected on a payroll with Spidle's name on it either before or after the accident.

█ Petitioner contends that the evidence is insufficient to establish reformation. We believe that from all of the circumstances and the statutory law a case is made for insurance coverage by petitioner. It is clear that the only thing sought to be achieved by Cornish was the change in the name of the insured from a partnership to him as the succeeding individual owner. Certainly he did not contemplate that the coverage of his policy was to be reduced by such change. He wanted just as full protection as he had before. The change in name was a mere formality. The circumstances present a situation peculiarly within the spirit of the statutory law. ''In the case of partners, joint owners, or owners in common, who are jointly insured, a transfer of interest by one to another thereof does not avoid insurance, even though it has been agreed that the insurance shall cease upon an alienation of the subject insured'' (Ins. Code, § 304), and the cases holding thereunder that an insurer is liable for an injury to the employee of an individual, who was formerly a partner in a partnership, covered by insurance, the business of which partnership he has acquired and no change in name was made after the dissolution of the partnership. (*First Nat. T. & S. Bank* v. *Industrial Acc. Com.*, 213 Cal. 322 [2 P.2d 347, 78 A.L.R. 1324]; *National etc. Co.* v. *Industrial Acc. Com.*, 29 Cal.App.2d 336 [84 P.2d 201]; see *Reed* v. *Industrial Acc. Com.*, 10 Cal.2d 191 [73 P.2d 1212, 114 A.L.R. 720].) The case of *Ocean A. & G. Corp.* v. *Industrial Acc. Com.*, 104 Cal.App. 34 [285 P. 707] is not controlling, for it holds that where, in a workmen's compensation policy, a partnership is the insured and the partners are not covered, the dissolution of the partnership and ensuing employment of the retiring partner by the individual continuing the business is not covered by the policy by reason of section 2557 of the Civil Code, the predecessor of section 304 of the Insurance Code. There was no situation there created which would operate as a trap for the unwary.

█ While it is true that a careful reading of the policy would show that when the name of the insured was changed from a partnership to that of an individual succeeding partner, employees who were relatives of the individual insured would be excluded, if not specially covered as such, yet section 304 of the Insurance Code, *supra*, indicates that the ''interest in the insurance'' passes when one partner buys out the others. That interest should embrace the character of the employees covered. Cornish was justified in assuming that the mere change in name would not limit the full protection he theretofore had

and intended to have in the new policy. Petitioner's assertion that Haugen's knowledge was Cornish's knowledge, and the fact that Haugen testified that he knew a policy issued to an individual insured did not cover relatives unless so specified, is not significant, for it would not necessarily follow that Cornish knew that a mere change in name of the insured would have such effect. Haugen contacted the insurer and no such problem was mentioned. Furthermore, the credibility of his testimony was for the commission. It will be remembered that Haugen communicated with petitioner's office as to the mode of procedure when a partnership sells to one of the partners, but was not advised of the effect on the character of the employees covered by the policy by the change of the capacity of the insured.

There is some analogy to the renewal cases in the policy expressed by section 304 of the Insurance Code. ■ Where an insured requests an existing but expiring policy to be renewed, no change may be made in the terms of the renewal policy without notice to the insured. (*Connecticut Fire Ins. Co.* v. *Oakley Improved Bldg. & L. Co.*, 80 F.2d 717; *Ouachita Parish Police Jury* v. *Northern Ins. Co.* (La.App.), 176 S. 639.) As above seen, the policy may be interpreted to mean that a change in the name of the insured would result in a change of the employees covered. That is not true in the renewal cases, but here we have more. ■ The petitioner-insurer should have anticipated that Cornish would believe that his relatives would not be excluded by his purchase of the partnership. Haugen was the agent for the insurer in the collection of premiums and it may be said that by that process he became aware of the presence of Spidle's name on the payroll, inasmuch as the premiums are based on the payroll. He knew Spidle was a relative. The premiums which were based on the payroll containing Spidle's name were paid to and retained by petitioner. This has some significance even though such premium would not be enough to cover Spidle as a relative of Cornish, when we consider that Spidle's pay should not form any part of the basis for the premium if the policy did not cover him at all because of his relationship to Cornish, and, further, that petitioner did not even deliver a policy until about three months after it was applied for, and some time after Spidle's fatal accident.

■ Petitioner relies upon such cases as *Westerfeld* v. *New York Life Ins. Co.*, 129 Cal. 68 [58 P. 92, 61 P. 667]; *Sharman* v. *Continental Ins. Co.*, 167 Cal. 117 [138 P. 708, 52 L.R.A.N.S.

670]; *Cayford* v. *Metropolitan Life Ins. Co.*, 5 Cal.App. 715 [91 P. 266], and *Hargett* v. *Gulf Ins. Co.*, 12 Cal.App.2d 449 [55 P.2d 1258], for the proposition that knowledge of a soliciting agent is not the knowledge of the insurer. The extent or nature of the application of such a rule is not clear (see *Banker's Indem. Ins. Co.* v. *Industrial Acc. Com.*, 4 Cal.2d 89 [47 P.2d 719]; *National Auto. & Cas. Co.* v. *Industrial Acc. Com.*, *ante*, p. 20 [206 P.2d 841]), but in any event it would not be of any significance when section 304 of the Insurance Code is considered. Under the circumstances of this case, that section continued the coverage and rendered it effective at the time the liability for compensation arose, that is, the Insurance Code provision preserved the coverage although one of the partners bought the other's interest, and the award is sustainable on that ground.

The award is affirmed.

Gibson, C. J., Shenk, J., and Schauer, J., concurred.

TRAYNOR, J.—Section 304 of the Insurance Code (formerly Civ. Code, § 2557) provides: ''In the case of partners, joint owners, or owners in common, who are jointly insured, a transfer of interest by one to another thereof does not avoid insurance, even though it has been agreed that the insurance shall cease upon an alienation of the subject insured.''

Under this section a partnership policy of workmen's compensation insurance is continued on behalf of an individual expartner after dissolution of the partnership (*First National T. & S. Bank* v. *Industrial Acc. Com.*, 213 Cal. 322 [2 P.2d 347, 78 A.L.R. 1324]; *National Auto. Ins. Co.* v. *Industrial Acc. Com.*, 29 Cal.App.2d 336 [84 P.2d 201]); thus dissolution does not entail a forfeiture of the insurance. What is the coverage of the insurance contract while it is so continued? The language of the code—''a transfer of interest . . . does not avoid [the contract of]* insurance''—leads to the conclusion that the insurance coverage before partnership dissolution is continued by section 304 at least so long as the policy does not expire or is not terminated by the parties. Under section 304, the insurance held by the partners was not avoided by the transfer from Schultz to Cornish of his interest in the partnership. To ascertain what protection continues after disso-

---

*Insurance is defined in section 22, Insurance Code, as "a contract whereby . . ."

lution, one need inquire only which employees were covered by the contract between the partners and the company. All four employees of the partnership, including Spidle, were covered by the insurance, for the clause of the policy excluding relatives was irrelevant to that contract.

In the only case dealing expressly with the coverage of a contract continued under section 304, *Ocean A. & G. Corp.* v. *Industrial Acc. Com.*, 104 Cal.App. 34 [285 P. 707], the continuation-of-partnership-contract interpretation, was adopted by the court and resulted in restriction of the insurer's liability. The court was confronted with a dissolved partnership and a claim by one who was formerly a partner but only an employee of his expartner when injured. The policy issued to the partners, which remained unchanged after dissolution of the partnership, provided that "this policy shall not apply to any member of such partnership . . ." The court held that the injured expartner employee was not covered by the policy even after the change in the partnership. He was not covered when the contract was made, and the policy issued to the partnership continued without change under section 304. Spidle's case is simply the converse situation. Since he was covered when the contract was made, he was covered during the period of its continuance under section 304.

The controlling question therefore is whether that policy was cancelled before the injury resulting in Spidle's death. It is my opinion that the submission of the policy to the company did not result in cancellation, for cancellation was conditional on the continued existence of insurance protecting the employer.

Haugen telephoned the insurance company and inquired about the proper procedure to follow in changing the business entity on the policy. He was instructed to send in the old policy for cancellation and was told that a new policy would then be issued, to be effective retroactively. It is unquestioned that both parties intended the employer to have the benefit of insurance during the interim the new policy was in preparation. Since Cornish was protected by section 304 under the original policy, cancellation would have been for the sole benefit of the insurer as well as at its direction. I cannot believe that either party contemplated cancellation apart from the effective creation of a new contract of insurance.

After noting that contract negotiation must be judged objectively by the manifestations of the parties, the dissenting opinion relies on the legal conclusion of Haugen's secretary

that "We cancelled Mrs. Cornish's old insurance policy . . ." even though the opinion thereafter shows at length that Haugen was not the company's agent and could not cancel the policy. A letter from Haugen is also quoted as a manifestation of an intent to cancel. "The letter, directed to the insurer, reads: 'Re: #546-07595-R.C. Cornish & Schultz DBA Cornish & Schultz, Crane Co.

> Please cancell [Sic] policy effective 8-1-46 as there has been a change of entity. . . .
> Please rewrite this policy effective 8-1-46 as follows:
>> R. C. Cornish, an individual, DBA R. C. Cornish Crane Service. . . .
> Enclosed find check of net to cover payroll audit on R. C. Cornish from 8-1-46 to 10-1-46. . . .' "

This letter does indicate an intent to cancel. But in addition, it manifests the request of the cancelling party for insurance that would be *effective* on August 1, 1946. The objective theory of contracts properly limits our inquiry to the manifestations by the parties of their intent, but does not preclude consideration of the acts and words of the principals in the light of their obvious purposes. In that light, it is clear that Cornish's consent to cancellation and Haugen's authority to cancel were granted on condition that a contract of insurance would be in existence at the moment the old coverage ceased. (*K. C. Working C. Co.* v. *Eureka-Security F. & M. Ins. Co.*, 82 Cal.App.2d 120 [185 P.2d 832]; *Poor* v. *Hudson Ins. Co.*, 2 F. 432; *Holden* v. *Putnam F. Ins. Co.*, 46 N.Y. 1 [7 Am.Rep. 287]; *Aetna Ins. Co.* v. *Rosenberg*, 62 Ark. 507 [36 S.W. 908].)

There was no new contract at the time of Spidle's death because there was no agreement about the extent of coverage. Cornish had only four employees. He never agreed or authorized Haugen to agree to coverage of only half of his work force. The dissenting opinion states: "In the absence of fraud, one who accepts an instrument which on its face is a contract, is deemed to assent to all of its terms, and he cannot escape liability upon the ground that he has not read it." But Cornish did not receive the instrument that purported to represent his contract with the insurer until weeks after the fatal accident. The dissent also points to the original policy issued to the partnership. "There was ample opportunity for Cornish to examine the limitation in the first policy, which was the same standard form used in specifying the new coverage." But Cornish could not have been certain on October

23, 1946, that the "same standard form" used to insure the partnership would be issued to him on January 17, 1947. Moreover, I cannot agree that the use by an insurer of a multiple-purpose form, with clauses in the alternative for different factual situations, can bind one formerly insured to knowledge of all the clauses in the policy totally irrelevant to the contract evidenced by the policy. If Cornish knew any clause in the old policy, it was the one stating, in bold type, "Failure to secure the payment of full compensation benefits to ALL EMPLOYEES is a misdemeanor." Cornish paid premiums for four employees and never manifested consent to be insured for any smaller number.

It is difficult to ascertain what intent the insurer manifested concerning the issuance of a new policy. Once it is assumed that Haugen was not the insurer's agent, the only link to the insurance company is found in the telephone conversation that Haugen had with Mr. Furbush, presumably an agent of the company. No testimony of any agent capable of binding the company appears in the record. Because we have only the fragmentary report of the conversation by Mrs. Cornish, it would be unreasonable to assume that the insurance company had done anything but consent to its customary contract of insurance with an individual, under which relatives of the insured are excluded.

Since the parties never agreed on the coverage of the insurance, no new contract existed at the time of Spidle's death. The condition for cancellation was therefore not fulfilled. (*K. C. Working C. Co.* v. *Eureka-Security F. & M. Ins. Co.*, 82 Cal.App.2d 120 [185 P.2d 832] ; *Tarleton* v. *DeVeuve,* 113 F.2d 290 [32 A.L.R. 343] (Cal.App. 9th).) Since the partnership policy, which covered Spidle and was continued under section 304, was not cancelled at the time of his death, the award must be affirmed.

In affirming the award, it must be recognized that the Industrial Accident Commission ordered the reformation of a contract to which the parties never agreed. The problem is academic, however, since the company is liable under the partnership policy for the amount of the award. The company was not prejudiced by the award of reformation because the new policy as issued on January 17, 1947, did cover the only surviving employee-relative. In any event, the policy that the commission erroneously attempted to reform has expired.

Spence, J., concurred.

EDMONDS, J.—I cannot agree that section 304 of the Insurance Code "continued the coverage [of the policy originally written by the insurer] and rendered it effective at the time the liability for compensation arose." That policy, it appears without conflict, was delivered to the insurer for cancellation before the accident to Spidle occurred. The evidence also shows the acceptance by the insurer of coverage to replace that of the cancelled policy, the new insurance being written as ordered by the agent of the insured.

According to the majority opinion, "Haugen was an insurance broker who procured the partnership policy for the partnership. While in such capacity he was the agent for the partnership, and later, for Cornish in connection with the procurement of the insurance." Schultz sold his interest in the business to Cornish in July and the partnership was dissolved on August 1st. Evidently nothing was done about the insurance until October when Mrs. Cornish and Haugen discussed the policy which was then in effect. He telephoned Furbush of the insurance company for instructions. Furbush stated that it would be necessary to cancel the old policy and write a new one.

The telephone call was made in Mrs. Cornish's presence, and she left the policy written for the partnership with Haugen for cancellation. Anne Kodak, secretary to Haugen, testified that "We cancelled Mrs. Cornish's old insurance policy . . . and I mailed in the old policy with the check for the new premium and payroll report at that time."

A letter identified as having been written by Haugen immediately after the interview with Mrs. Cornish fully corroborates the testimony as to the cancellation of the partnership policy. The letter, directed to the insurer, reads:

"Re: #546-07595-R.C. Cornish & Schultz DBA Cornish & Schultz, Crane Co.

Please cancel policy effective 8-1-46 as there has been a change of entity. . . . and . . . rewrite this policy effective 8-1-46 as follows:

R. C. Cornish, an individual, DBA R. C. Cornish Crane Service. . . .

Enclosed find check of net to cover payroll audit on R. C. Cornish from 8-1-46 to 10-1-46. . . ."

Unquestionably the insurer accepted these instructions from Haugen and changed its coverage accordingly. As stated in the majority opinion, "presumably [the original policy] was

cancelled." Although the new policy reached Haugen after Spidle was killed, nevertheless there is evidence that it was issued prior to the accident and had been mailed to Haugen.

Mrs. Cornish, as the agent for her husband, manifested her consent to the terms of the new policy by authorizing Haugen to request the insurer to cancel the then existing insurance and rewrite the policy effective as of August 1st in the name of R. C. Cornish, an individual, doing business as R. C. Cornish Crane Service. She was present during Haugen's telephone conversation with the insurer, and made no objection to having the new insurance issued to her husband as an individual.

Her state of mind is immaterial (*Zurich etc. Assur. Co.* v. *Industrial Acc. Com.*, 132 Cal.App. 101, 104 [22 P.2d 572]). Objectively, both the insured and the insurer manifested consent to the issuance of the new policy. The insured cannot be excused upon the ground that the terms of the policy were not read. There was ample opportunity for Cornish to examine the limitation in the first policy, which was the same standard form used in specifying the new coverage. In the absence of fraud, one who accepts an instrument which on its face is a contract, is deemed to assent to all of its terms, and he cannot escape liability upon the ground that he has not read it (*Greve* v. *Taft Realty Co.*, 101 Cal.App. 343, 352 [281 P. 641]). There would be no point whatsoever in stating the terms of an insurance policy if its conditions and limitation may be vitiated, as suggested in the majority opinion, by the insured's inquiry: "Are we fully covered?" If that were the law, an affirmative answer to such a question might subject the insurer to liability for fire, theft, burglary or other hazards in a policy the terms of which included no such coverage.

Although the majority opinion does not expressly state that Haugen was the agent of the insurer with general powers and to such an extent as to make his knowledge imputable to the company, the decision is impliedly placed upon that ground. As a basis for affirming the award it is said: "There is evidence from which it may be inferred that he was petitioner's agent for the collection of premiums on policies inasmuch as the invoices or bills for premiums from petitioner stated that Cornish should pay the premiums to 'your agent' Haugen." But until this time it would seem to have been settled that an agent for collection of premiums is not an agent for coverage or other purposes. (*Detroit T. Co.* v.

*Transcontinental Ins. Co.*, 105 Cal.App. 395 [287 P. 535];
*Parrish* v. *Rosebud M. & M. Co.*, 140 Cal. 635 [74 P. 312];
*Bennett* v. *Northwestern Nat. Ins. Co.*, 84 Cal.App. 130 [257 P.
586].) It is a general rule, apart from controlling factual
variations, that an insurance broker is the agent of the in-
sured "for the purpose of procuring the policy *and the in-
surer only in order to receive and transmit the premiums.*"
(*Overland Sales Co.* v. *American Indem. Co.* (Tex.Civ.App.),
256 S.W. 980, 982; 16 Appleman, Insurance Law and Practice
[1944] § 8725.) "It is also the general rule that the knowl-
edge of a broker as to facts or matters pertaining to the risk,
while imputable to the insured, *is not imputable to the in-
surer.*" (16 Appleman, *supra*, § 8730, p. 163; *Ben Franklin
Ins. Co.* v. *Weary*, 4 Ill.App. 74; *Reser* v. *Southern Kans. Mut.
Ins. Co.*, 150 Kan. 58 [91 P.2d 25, 28]; *Bonewell* v. *North
American Acc. Ins. Co.*, 167 Mich. 274 [132 N.W. 1067, Ann.
Cas. 1913A 847]; *Fire Assn. of Pila* v. *American Cement
Plaster Co.*, 37 Tex.Civ.App. 629 [84 S.W. 1115].) Haugen
was not an agent of the insurer; he was a broker, and his inci-
dental function of collecting the premiums upon insurance
procured by him was not sufficient to charge the insurer with
his knowledge for any purpose whatever. Everything which
he did in connection with the cancellation of the partnership
policy and the procurement of the second policy was in his
capacity as the agent of Cornish.

Under these circumstances there is no factual basis what-
ever for affirming the award upon the ground that section 304
of the Insurance Code governs the rights of the parties.
The statute is inapplicable where, as here, the initial insur-
ance policy is replaced by a subsequent one. The background
and basic purpose of the code section clearly demonstrate that
it was never intended to continue an insurance agreement in
effect when the original coverage is replaced by a subsequent
contract.

A basic rule in the insurance field is that an insurance con-
tract is ". . . considered to be personalized in its risks,
involving the moral hazard of possible destruction by the
insured, risks of carelessness or neglect, and the courts are
reluctant to require the companies to assume dangers not con-
templated, and to require them to protect persons with whom
no contract was ever made. Being such a personal contract, it
is avoided by a sale of the insured property." (4 Appleman,

Insurance Law and Practice [1941], § 2741, p. 629, citing *Lyford* v. *Connecticut Fire Ins. Co.,* 99 Me. 273 [58 A. 916] and *Allison* v. *National Union Fire Ins. Co.,* 163 Tenn. 246 [43 S.W.2d 202].) However, the rule has been qualified to the extent that ". . . where a change in title is merely nominal, and not such as would increase a motive to burn the property or to decrease safeguards surrounding it, the provision [rendering the policy void is] . . . not . . . violated." (4 Appleman, *supra,* at p. 632, citing *Forward* v. *Continental Ins. Co.,* 142 N.Y. 382 [37 N.E. 615].) Thus, although public policy in general favors the absolute avoidance of insurance when the property is alienated, the courts have refused to apply the rule when the alienation is nominal or essentially so, as in the case of a conveyance from one partner to another, or in the case of dissolution of partnership.

Section 304 reads: *"Transfer by partner.* In the case of partners, joint owners, or owners in common, who are jointly insured, a transfer of interest by one to another thereof does not avoid insurance, even though it has been agreed that the insurance shall cease upon an alienation of the subject insured." By another statute, insurance is defined as ". . . . a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (Ins. Code, § 22.) Applying this definition to section 304, it reads: "In the case of partners . . . who are jointly insured, a transfer of interest by one to another thereof does not avoid [the contract of] insurance, even though it has been agreed that the [contract undertaking the indemnification] . . . shall cease upon an alienation of the subject insured." Its principal purpose is to prevent the avoidance of insurance upon alienation of the subject matter in the case of dissolution of a partnership. The section was not intended to abolish the familiar contract rule that a contract is rendered ineffective by mutual consent when it is replaced by a subsequent contract dealing with the same subject matter and containing terms inconsistent with those of the original agreement. The new policy expressly excluded Spidle from its coverage by providing: "If this policy is issued to an individual . . . it is agreed that; anything in this policy to the contrary notwithstanding, this policy does not insure: As respects injuries (or death resulting therefrom) sustained by any of the following relatives of the employer, i. e., . . . son-in-law . . . unless such relative is specifically named in item (III) of the Declarations or specifically insured by Endorse-

ment attached to this policy.'' Spidle was not named in item (III) nor was he included in the coverage by endorsement.

For these reasons, in my opinion, the award should be annulled.

Petitioner's application for a rehearing was denied December 29, 1949. Edmonds, J., voted for a rehearing.